UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE RESTRAINT OF ASSETS OWNED OR CONTROLLED BY ITZHAK GRYNSZTEIN, ILONA GRYNSZTEIN, OMER GRYNSZTEIN, NACHMAN GRYNSZTEIN, AND CPG WORLDWIDE N.V. | Misc. No. _____ |

**UNITED STATES' EX PARTE APPLICATION
TO REGISTER AND ENFORCE FOREIGN RESTRAINING ORDERS
PURSUANT TO 28 U.S.C. § 2467(d)(3) AND 18 U.S.C. § 983(j)**

Applicant United States of America, by and through its undersigned attorneys, respectfully submits this application for a restraining order pursuant to 28 U.S.C. § 2467(d)(3) and 18 U.S.C. § 983(j). The application seeks enforcement of five related foreign restraining orders issued by the District Court in Overijssel, in Zwolle, the Netherlands in order to preserve the availability of U.S. assets that are subject to confiscation (forfeiture) in the Netherlands. The assets will be restrained pending the presentation of final Dutch confiscation judgments to the United States' central authority for execution pursuant to the relevant bilateral treaty.

Four of the Dutch Restraining Orders were issued on June 1, 2015, and one was issued on June 23, 2015. All five of the Dutch Orders stem from criminal financial investigations into five suspects, to include four persons and one legal entity, on suspicion of money laundering in violation of Dutch Penal Code § 420bis. The criminal financial investigations (known by their Dutch acronym as "SFOs") were authorized by the Dutch court, pursuant to the Dutch Code of Criminal Procedure § 126, on January 20, 2015 (for the legal entity) and April 1, 2015 (for the natural persons), based on a report by the Dutch Public Prosecutor. The SFO authorizations from the Dutch court state that the suspected criminal offense, money laundering, likely resulted

1

in considerable profits, and that the purpose of the SFO is to "determine the size of the illegal proceeds obtained by the suspect[s] and to confiscate these proceeds pursuant to Section 36e of the Penal Code." The main target of the Dutch investigation, Itzhak Grynsztein ("I.A. Grynsztein") was recently arrested in the Southern District of Florida pursuant to a provisional arrest request from the Netherlands. Arrests were also made in the Netherlands and in Curaçao. The Dutch authorities plan to seek the extradition of I.A. Grynsztein and intend to charge him, and certain of his family members, with money laundering, based on the predicate criminal activity of acting as a money transaction office without a license, failure to report suspicious transactions as a money transaction office, and forgery.

The Dutch Restraining Orders have been certified for enforcement by the Assistant Attorney General ("AAG") of the U.S. Department of Justice's Criminal Division in accordance with 28 U.S.C. § 2467(d)(3) and (d)(3)(B)(ii). *See* Ex. A, AAG Certification and Dutch Restraining Orders. This application seeks to restrain nine investment accounts worth more than $300,000, four bank accounts worth approximately $60,000, and two pieces of real property in Florida valued at a combined total of approximately $1.4 million, all owned or controlled by the above-captioned suspects of the Dutch investigation. If granted, this U.S. restraining order will preserve the assets pending the conclusion of criminal and confiscation proceedings in the Netherlands.

## I. JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 2467. Venue is proper in this Court pursuant to § 2467(c)(2)(B), which provides that "venue shall lie in the district court for the District of Columbia or in any other district in which the defendant or the property . . . may be found."

## II.  APPLICATION

The United States seeks issuance of a restraining order pursuant to § 2467(d)(3) to enforce five Dutch Restraining Orders against a total of fifteen assets owned or controlled by the Dutch suspects. On May 20, 2015, the Department of Justice's Office of International Affairs ("OIA") referred a mutual legal assistance ("MLA") request from the Netherlands to the Asset Forfeiture and Money Laundering Section ("AFMLS") of the Department of Justice. The MLA request seeks, among other things, the enforcement of a series of Dutch Restraining Orders which were subsequently issued on June 1 and June 23, 2015, by Examining Judge V. Vuure of the District Court in Overijssel, in Zwolle, the Netherlands.

The natural and legal persons named in the five orders—Itzhak Grynsztein, Ilona Grynsztein, Omer Grynsztein, Nachman Grynsztein, and Caribbean Pharmaceutical Group Worldwide N.V. ("CPG")—are suspects in an ongoing investigation conducted by the Public Prosecutor in Rotterdam, Holland, along with the FIOD (Fiscal Information and Investigation Service) in Utrecht, part of the National Investigative Service, a Dutch law enforcement agency. The proceeds of the suspects' alleged money laundering, predicated by the operation of an unlicensed money transmitting business and other offenses, were generated during the period from at least 2010 to the present.[1] The Dutch Restraining Orders are based upon sufficient evidence that assets named in the Orders represent substitute assets belonging to the criminal suspects, are themselves criminal proceeds, or were purchased with criminal proceeds. The United States, with the appropriate certification of the Assistant Attorney General annexed hereto as Exhibit A, applies to this Court to issue an order restraining real property and financial assets located in the United States, more particularly described in Table 1 below:

---

[1] The Dutch MLA request also describes evidence that some of the funds transmitted through the operation of the unlicensed money transmitting business may be the proceeds of drug trafficking and/or an alleged illegal lottery business operating in Curaçao and St. Maarten, independent jurisdictions within the Kingdom of the Netherlands.

3

<u>Table 1</u>

*Assets to Be Restrained Pursuant to Five Dutch Restraining Orders*

| Asset Description | Asset Type | Owned or Controlled by Dutch Suspect | Ordered Restrained by the Dutch Court in Case No. |
|---|---|---|---|
| 49H508928, 49H508936, 49H508944, and 49H508951 (in the name of AGAF Holding); 49H505619 (in the name of Moody Tunes); 49H502590; (in the name of I.A. Grynsztein); 49H300458 (in the name of The Grynsztein Family) | Seven investment accounts held by Pershing LLC, a wholly owned subsidiary of the Bank of New York Mellon | Itzhak Grynsztein | 08/960068-15 |
| 21348 Greenwood Ct., Boca Raton, FL 33433 | Real Property | Itzhak Grynsztein and Ilona Spar (married) | |
| 9115832731 | Bank account at Citibank, N.A.[2] | Ilona Spar | 08/960069-15 |
| 003674508375 | Bank account at Bank of America, N.A. | Omer Grynsztein | 08/960070-15 |
| 49H505676 (in the name of Atlantic World) | Investment account held by Pershing LLC | Omer Grynsztein | |
| 20720 NE 32nd Pl. Aventura, FL 33180 | Real Property | Omer Grynsztein and Eva Sencianes (married) | |
| 898040247394 | Bank account at Bank of America, N.A. | Nachman Grynsztein | 08/960071-15 |
| 49H500321 (in the name of Nachman Grynsztein) | Investment account held by Pershing LLC | Nachman Grynsztein | |
| 898000940071 (held in the name of Caribbean Distributors Group, Inc.) | Bank account at Bank of America, N.A. | CPG Worldwide N.V. | 08/960088-14 |

---

[2] The relevant Dutch Restraining Order mistakenly refers to "City Bank" instead of "Citibank." Investigation has confirmed that the specified account is indeed at Citibank and was opened at the West Boca branch located at 9955 W. Glades Rd., Boca Raton, FL 33434.

4

## III. FACTUAL BACKGROUND

The evidence in the Dutch criminal proceedings shows that Itzhak, or I.A. Grynsztein, a Dutch national born in Peru, appears to split his time between Curaçao and Boca Raton, Florida, where his wife and children reside. His business interests and suspected criminal activity, however, are based in Curaçao, where he and certain family members own and operate a series of companies. The company at the center of the Dutch criminal investigation is CPG.

Itzhak, his father Nachman, and brother Omer are the managers of CPG, and Nachman is the sole shareholder. CPG was incorporated in 2009 as a trading company in one of Curaçao's Free Trade Zones. As a Free Trade Zone company, it may only engage in the wholesale purchase and sale of goods under Curaçao law, but it may not provide financial services.[3] CPG was allegedly formed to trade in pharmaceuticals but it appears never to have done so. In 2010, CPG registered in the Netherlands, where its stated business purpose was changed, within months, from pharmaceutical sales to trade in women's apparel.[4]

Thereafter, in Amsterdam, CPG opened an ING Bank account and entered into an agreement with B&S Cardservice GmbH ("B&S"), a legitimate payment service provider ("PSP") based in Germany. I.A. Grynsztein appears to exercise regular control over CPG, and CPG represented to B&S that it was acquiring PIN (Personal Identification Number) terminals used to process credit card transactions for use in its retail store selling womenswear in Amsterdam. Dutch investigators have concluded that no such retail store exists in the Netherlands, and no pharmaceuticals, nor any significant quantity of clothing, were sold in the

---

[3] Companies can establish themselves in Curaçao's Free Zone and benefit from a low tax rate on the conditions that at least 75% of the business' turnover is realized from sales to foreign customers and that the goods actually leave Curaçao.

[4] The Grynszteins also registered another Curaçao Free Zone company called "Caribbean Distributors Group NV," which operates as CDG (UK) Ltd. in the United Kingdom and as CDG UK Ltd. in the United States. One of the accounts sought to be restrained pursuant to the Restraining Order issued on June 23, 2015, is in the name of Caribbean Distributors Group Inc., and this account is controlled and owned by the Grynsztein family and would be subject to forfeiture in the Netherlands as a substitute asset.

Netherlands or Curaçao by CPG. Instead, according to Dutch investigators, I.A. Grynsztein took the PIN terminals to Curaçao and used them to process credit card transactions on behalf of Venezuelan citizens, who often traveled the short distance to Curaçao in order to obtain money, evading Venezuela's capital flight restrictions.

According to the Dutch investigation, the credit card transactions, processed by B&S, resulted in credits to the Euro account of CPG at ING Bank in the Netherlands. Thus, Venezuelan residents could move money without detection by Venezuelan authorities, and I.A. Grynsztein, through the ING account, could transmit the funds, on the instructions of his Venezuelan customers, anywhere in the world, using CPG, a Free Trade Zone company with the apparent purpose of buying and selling clothing. The Dutch have determined that CPG conducted little or no wholesaling, contrary to representations made by CPG to ING Bank and B&S. Rather, CPG was a front company used to conduct unlicensed financial services and it failed to report suspicious transactions as required under Dutch anti-money laundering law. From 2010 through 2014, CPG transferred approximately $161 million to numerous third parties, both persons and legal entities. The main recipients of money from CPG's ING account (and later, from its German bank account) are located in Curaçao, the United States, and Panama. An estimated $82 million has entered the United States as a result of CPG's unlicensed and unregulated money services business. The Dutch investigators estimate that the suspects, CPG, I.A. Grynsztein, and his family members, have profited in the amount of $13.5 million from this scheme.

B&S, the German PSP, was alerted to the fact that its PIN terminals were moved, without its knowledge, to Curaçao, where they were mainly used to process transactions using Venezuelan credit cards. B&S concluded for several reasons that CPG did not fit the profile of a

customer in the clothing business and suspended its relationship with CPG in 2013. ING Bank also began to question the nature and volume of transactions conducted through in the CPG account in 2013. The immense money flows were not in keeping with the stated purpose of the ING account when CPG opened it in 2010. Not satisfied with I.A. Grynsztein's responses to its inquiries, ING closed the account on January 1, 2015. Between the time CPG lined up another PSP and the time ING Bank closed CPG's account, the Dutch investigators note an almost complete stoppage of activity in CPG's ING account. CPG reached an agreement with a Bulgarian PSP in late 2013, at which point, transactions continued until ING terminated its relationship with CPG. If there was legitimate retail or wholesale business conducted by CPG, some regular account activity would be expected. Eventually, CPG opened a German bank account, and with its new arrangement with the Bulgarian PSP, the flow of funds into and out of CPG's Euro accounts resumed.

It should be noted that I.A. Grynsztein and his family members control a number of companies and businesses in Curaçao engaged in the sale of various items, including handbags, clothing, watches, and real estate. These companies are presented on a public website as part of the Monterrey Group, and Dutch and FBI investigations have revealed that iterations of the Monterrey companies appear to operate as sub-agents of a *licensed* money services business, namely, Western Union. However, Dutch investigators have concluded that the legal money services conducted by Monterrey under the guise of Western Union are separate and apart from the *illegal* money services transacted by CPG, which is not licensed, and which could not be licensed to conduct financial services under Curaçao law because it is a Free Trade Zone company. Moreover, the transactions conducted by CPG differ from typical, licensed Western Union transactions. Generally, persons wishing to remit money using Western Union pay cash,

which is presented to the sub-agent, transmitted to the sub-agent's local bank account, and then pooled into a Western Union account to be remitted as on the directions of the customer. CPG's model differs. It appears to remit money on behalf of Venezuelan customers who pay with credit cards, not cash; it does not utilize local bank accounts (the German, then Bulgarian, PSP credits into foreign Euro bank accounts); and it does not use Western Union or its accounts at any point to conduct transactions. Thus, the Dutch investigation strongly indicates that I.A. Grynsztein uses CPG to conduct illegal financial services, without a license, under a Free Trade Zone company that uses "trade in clothing" as a cover for international money remitting.

The illicit CPG conduct allegedly accounts for 85-90% of annual receipts for all the Grynsztein family-controlled companies, while only a small amount of business revenue is believed to be from legitimate trade or licensed financial services. I.A. Grynsztein stated to law enforcement authorities in Curaçao on two prior occasions, that he moved money for people for a 5% fee. Dutch investigators suspect that CPG also operated based on a similar commission or fee model.[5] Additionally, in 2007, Grynsztein told authorities that the combined family businesses in Curaçao, including all of the Monterrey companies, did approximately $5 million in business. However, Dutch investigators can show that the ING account used for the wholesale clothing business conducted transactions totaling $20 million in 2010 and $55 million in 2011. Considering that few if any clothes were sold in small storefronts in Curaçao by the companies owned by the family during the relevant time period, and that money flows increased again in

---

[5] I.A. Grynsztein is known to investigators in Curaçao and the Netherlands as a person who moved suspected proceeds of an illegal lottery business in Curaçao for its boss, Robertico Dos Santos, who is facing criminal charges in Curaçao. This Court previously has restrained nearly $30 million in funds owned or controlled by Dos Santos in Miami-based investment accounts in connection with mutual legal assistance provided by the United States to Curaçao. See Second Am. Restraining Order, ECF No. 22, *In re Restraint of All Assets Contained or Formerly Contained in Certain Inv. Accounts at UBS Fin. Servs., Inc. Held in the Names of Caribbean Investment Group, Ltd., Ponsford Overseas, Ltd., and Tula Finance Ltd.*, Misc. Action No. 11-452 (CKK) (D.D.C. May 17, 2012). I.A. Grynsztein helped establish shell companies and open accounts with a Texas broker-dealer on behalf of Dos Santos many years before another financial industry gatekeeper was used to launder Dos Santos' ill-gotten gains.

2014 after CPG began using the Bulgarian PSP, Dutch investigators believe that CPG's "trade" is a cover for an illegal or unlicensed money transmitting business.

## IV. LEGAL AUTHORITY

Pursuant to 28 U.S.C. § 2467(d)(3), federal courts are authorized to issue orders to preserve property during the pendency of foreign forfeiture proceedings until receipt of an enforceable, final foreign forfeiture or confiscation judgment. *See* Preserving Foreign Criminal Assets for Forfeiture Act of 2010, Pub. L. No. 11-342, 124 Stat. 3607 (codified as amended in 28 U.S.C. § 2467(d)(3)).[6] Section 2467(d)(3)(A) provides:

> [t]o preserve the availability of property subject to civil or criminal forfeiture under foreign law, the Government may apply for and the court may issue a restraining order at any time before or after the initiation of forfeiture proceedings by a foreign nation.

Section 2467(d)(3)(A) also requires that the U.S. restraining order be issued "consistent with subparagraphs (A), (C), and (E) of subparagraph [(d)](1) and the procedural due process protections for a restraining order under section 983(j) of title 18." 28 U.S.C. § 2467(d)(3)(A). Consequently, the district court may deny enforcement of a foreign restraining order if it finds that the order was obtained without due process, was issued by a foreign court that lacked subject matter jurisdiction, or was obtained by fraud. The statute's cross-references to § 983(j) do not require that criminal or civil forfeiture proceedings be filed in the United States to enforce a foreign court's restraining order, but rather, the foreign criminal or forfeiture proceedings initiated abroad should comport with U.S. notions of due process. *See* 28 U.S.C. § 2467(d)(3)(A)(ii)(II); *see also Luan v. United States*, 722 F.3d 388, 394-97 (D.C. Cir. 2013) (holding that the filing of a foreign civil forfeiture complaint is not required, but that "applicable" foreign criminal proceedings, sufficient to justify the restraint of assets indefinitely

---

[6] The statute now clearly authorizes courts to issue a restraining order "at any time before or after the initiation of forfeiture proceedings by a foreign nation." 28 U.S.C. § 2467(d)(3)(A)(i) (2012).

9

pending final forfeiture, should entail "procedural due process protections consistent with those that the filing of an American civil forfeiture complaint" would have afforded). In line with analogous procedures in a domestic civil or criminal forfeiture proceeding under 18 U.S.C. § 983(j), U.S. courts may issue orders appropriate to preserve property during the pendency of foreign criminal or forfeiture proceedings.

Certification by the U.S. Attorney General or her authorized designee that enforcement of the foreign restraining order is in the "interest of justice" is a prerequisite for enforcement of a foreign order. *See* 28 U.S.C. § 2467(b)(2). On May 9, 2006, the Attorney General delegated authority for the certification of orders under this provision to the Assistant Attorney General for the Criminal Division. *See* Ex. B, DOJ Order No. 2820-2006. The AAG's determination is not subject to judicial review. *See* 28 U.S.C. § 2467(d)(3)(B)(ii) and § 2467(b)(2).

V.     **DISCUSSION**

     A.     **The Dutch Restraining Orders Meet the Criteria for Enforcement Under § 2467(d)(3)(A).**

Section 2467 sets forth the following criteria that are relevant in considering a request for enforcement of a foreign restraining order: (1) whether the United States and the foreign nation seeking enforcement of the order are parties to a formal, international agreement providing for mutual forfeiture assistance, § 2467(a)(1); (2) whether the Attorney General has determined it would be in the interest of justice to certify the order for enforcement, § 2467(b)(2); (3) whether the foreign order was issued consistent with due process, § 2467(d)(3)(A)(ii)(I); (4) whether the foreign court had subject matter jurisdiction to issue the restraint, *id.*; and (5) whether there is any reason to believe the foreign order was obtained by fraud, *id.*[7] The Dutch Restraining Orders

---

[7] *See In re Restraint of All Assets Contained or Formerly Contained in Certain Investment Accounts at UBS Fin. Servs., Inc.*, 860 F. Supp. 2d 32, 42 (D.D.C. 2012) (asserting that in considering an application for a restraining order under § 2467(d)(3), a "district court should begin with the premise that the foreign proceedings or procedures are in

10

meet the above criteria for registration and enforcement pursuant to § 2467 and, therefore, entry of the proposed U.S. restraining order is both necessary and appropriate to preserve the property for eventual confiscation in the Netherlands.

1. Agreement on Forfeiture Assistance

First, the United States and the Netherlands are parties to formal, international agreements obligating each nation to provide mutual legal assistance in investigations, prosecutions, and other proceedings, including confiscation and the immobilization of assets.[8]

2. Attorney General Certification

Second, the Dutch Restraining Orders were certified by the Assistant Attorney General on August 7, 2015. The AAG, in certifying the order, acknowledged that she has considered the facts of the case, the foreign law, the applicable U.S. law, and the circumstances of the judiciary from where the orders came, and has concluded that enforcement of the foreign restraining orders pursuant to 28 U.S.C. § 2467 is "in the interest of justice." *See* Ex. A, p. 1, AAG Certification and Dutch Restraining Orders. Thus, the second criterion for enforcement is met.

3. Due Process

Third, the Dutch Restraining Orders appear to have been issued in a manner consistent with due process. The Dutch Public Prosecutor has properly sought and received from the Dutch court authorizations to begin the criminal financial investigations ("SFOs") pertaining to each suspect. To do so, the Public Prosecutor has made a showing to the court of suspicion of a

---

fact compatible with due process"). An affected party with a legally protected property interest may appear in this proceeding to challenge any U.S. restraining order issued as a result of this application by making an affirmative showing that the foreign order or process were defective.

[8] *See* Agreement Regarding Mutual Cooperation in the Tracing, Freezing, Seizure and Forfeiture of Proceeds and Instrumentalities of Crime and the Sharing of Forfeited Assets, arts. 2-3, U.S.-Neth., Nov. 20, 1992, T.I.A.S. No. 12,482; Treaty Between the Kingdom of the Netherlands and the United States of America on Mutual Assistance in Criminal Matters, U.S.-Neth., arts. 1, 6, June 12, 1981, 35 U.S.T. 1361.

criminal offense under Dutch law.[9] The Prosecutor's application to the court stated both the reasons that I.A. Grynsztein and others are suspected of committing certain felonies (money laundering, operating an unlicensed money transmitting business, forgery, failure to report suspicious transactions) and why it is believed that criminally derived assets exist, with a view toward confiscation (forfeiture) under the Dutch Penal Code § 36e. According to the Dutch Code of Criminal Procedure §§ 94 and 94a, an Examining Judge may issue a prejudgment restraining order to preserve property and secure the right of recourse with respect to confiscation of the proceeds and advantages of a qualifying serious offense. The Dutch Restraining Orders, issued pursuant to §§ 94 and 94a, are provisional measures which seek to preserve property and assets for later confiscation upon conviction.[10]

As permitted under Dutch law, the Dutch Public Prosecutor satisfied the court that the Dutch Restraining Orders must be issued ex parte because there was a risk that notifying the suspects before the Orders are registered and enforced in the United States could result in the dissipation of the assets. Therefore, I.A. Grynsztein, other affected family members, and CPG have not yet been given notice of the existence of the Dutch Restraining Orders. Should this Court see fit to enforce the Dutch Restraining Orders in the United States, and after the assets are secure, the Dutch authorities will provide notice of the Dutch Restraining Orders to I.A. Grynsztein and all other affected persons. Upon notice, under Dutch law, the owners of the

---

[9] The SFOs were authorized by the Dutch court against the suspects, pursuant to Section 126 of the Code of Criminal Procedures, on January 20, 2015 (for the legal entity) and April 1, 2015 (for the natural persons), based on an official report by the Public Prosecutor. The SFO authorizations state that the suspected criminal offense, money laundering, likely resulted in considerable profits, and that the purpose of the SFO is to "determine the size of the illegal proceeds obtained by the suspect[s] and to confiscate these proceeds pursuant to Section 36e of the Penal Code." Within the context of a properly constituted SFO, a number of investigative and provisional measures can be taken, including the issuance of restraining orders.

[10] Under § 94 of the Dutch Code of Criminal Procedure, assets subject to seizure include those which may be confiscated under Section 36e of the Dutch Penal Code. Section 94a of the Code of Criminal Procedure provides that suspicion of a criminal offense is a sufficient basis for the seizure of assets. Section 94a contains four subsections authorizing seizure in order to safeguard assets in the event of that a confiscation order or criminal fine is issued upon conviction for a criminal offense.

restrained properties will have an opportunity to object by filing a complaint in Dutch Court.

Finally, as described in Table 1, the real estate to be restrained includes homes and investment accounts that have not been determined to be the specific proceeds of crime because they predate the crimes in question. However, the Dutch have a legal concept similar to "substitute assets" in the United States whereby "clean" assets can be restrained pretrial in order to satisfy a post-conviction confiscation judgment for an amount of "illegal profits." *See* Dutch Code of Criminal Procedure §§ 126(2) (describing the SFO) and 94a (authorizing the seizure of assets to safeguard them for confiscation); Dutch Penal Code § 36e (setting out categories of assets subject to confiscation). Dutch investigators currently estimate the amount of illegal profits obtained by the suspects in this case to be $13.5 million, which is significantly more than the estimated value of all assets to be restrained in the United States, which is, conservatively, $1,760,800.

4. <u>Subject Matter Jurisdiction</u>

Fourth, Dutch authorities have represented that the District Court in Overijssel, in Zwolle, the Netherlands, is the proper authority to issue the Dutch Restraining Orders in this matter because it is the court with jurisdiction over the Dutch criminal financial investigation, or SFO. The United States has no reason to doubt this representation. Taking into account the presumption of regularity of foreign judicial proceedings and these facts, the fourth criterion for enforcement is met. *See In re Restraint of Certain Investment Accounts at UBS Fin. Servs., Inc.*, 860 F. Supp. 2d at 42.

5. <u>Absence of Fraud</u>

Fifth, taking into account the presumption of regularity in foreign proceedings and the facts known to the United States, there is no reason to believe that either the June 1, 2015 Dutch

Restraining Orders or the June 23, 2015, Dutch Restraining Order were obtained by fraud on the part of Dutch authorities. Accordingly, the five criteria pertinent in considering an application to enforce and register foreign restraining orders are satisfied.

### B.     Dual Forfeitability Is Satisfied.

In an application to enforce a foreign restraining order (as opposed to a final judgment), the United States, on a plain reading of the statute, may not need to show that the criminal conduct supporting the foreign restraining order would also give rise to forfeiture if it had been committed in in this country. *See* 28 U.S.C. § 2467(a)(2)(A) (defining "forfeiture or confiscation judgments" in such a way that requires a showing of dual forfeitability); § 2467(d)(3)(A)(ii)(I) and (d)(3)(B)(ii) (setting out the procedures for enforcement of a foreign restraining order with no mention of, nor cross-reference to, the subsection of the statute concerned with dual forfeitability). In the published decisions of this Court, one judge *has* applied the requirement without discussion, and another *declined* to resolve the question of whether dual forfeitability must be demonstrated by the United States in the restraint phase. *Compare In re Seizure of Approx. $12,116,153.14 and Accrued Interest in U.S. Currency*, 903 F. Supp. 2d 19, 30 (D.D.C. Nov. 9, 2012) (stating that dual forfeitability is a requirement for enforcement of a foreign restraining order and deciding that the United States satisfied it), *with In re Restraint of Certain Investment Accounts at UBS Fin. Servs., Inc.*, 860 F. Supp. 2d 32, 41 (D.D.C. May 17, 2012) ("[Section 2467(d)(3)] does not expressly incorporate the dual forfeiture requirement that applies to final orders of forfeiture . . . however, the Court need not resolve the question . . . because, even assuming its applicability, it is satisfied in this case"). As a practical matter, the United States acknowledges that dual forfeitability may become relevant if and when the Netherlands asks the United States to enforce a confiscation judgment and the United States applies to

14

enforce such a final judgment.

Here, dual forfeitability would be satisfied because I.A. Grynsztein's underlying acts would be chargeable under a variety of U.S. criminal laws giving rise to forfeiture, had his conduct been committed here. The offenses listed below are authorized for forfeiture and are also authorized for forfeiture when they constitute the predicate activity for a money laundering charge.[11]

Specifically, I.A. Grynsztein's actions could violate 18 U.S.C. § 1960, which prohibits the operation of an unlicensed money transmitting business. It appears that CPG's money remitting activity is conducted on behalf of the public, for a fee, without a license, as any license that Monterrey Group may have as a result of its agreement with Western Union does not appear to cover the transactions by CPG which are the basis for the Dutch criminal and confiscation proceedings for the following reasons: (1) CPG is a Free Trade Zone company that is not authorized to provide financial services, but is only authorized to buy and sell goods, mainly to foreigners; (2) CPG appears to provide money transmitting services that are initiated by credit card transactions and processed through foreign bank accounts, outside of the usual Western Union processes; and (3) there is strong evidence that I.A. Grynsztein conducts the activity on behalf of Venezuelan citizens who are attempting to evade Venezuelan laws relating to, among other possibilities, capital flight. Therefore, I.A. Grynsztein's acts are the equivalent of knowingly conducting an unlicensed money transmitting business, or, transporting or transmitting funds known to him to derive from criminal offenses, or which were intended to be

---

[11] *See* 18 U.S.C. § 981(a)(1)(C) (civil forfeiture of any property which constitutes or is derived from proceeds traceable to any offense constituting "specified unlawful activity"); § 981(a)(1)(A) (civil forfeiture of any property involved in a transaction in violation of the money laundering statutes or 18 U.S.C. § 1960, prohibition of unlicensed money transmitting businesses); § 1956(c)(7)(A) (defining specified unlawful activities to include unlicensed money transmitting and fraud against a foreign bank); § 982(a)(1) (criminal forfeiture of property involved in money laundering offenses or violations of 18 U.S.C. § 1960); *see also* 28 U.S.C. § 2461 (modes of recovery for offenses authorizing criminal or civil forfeiture).

15

used to promote or support unlawful activity. *See* 18 U.S.C. § 1960(b)(1)(A) and (C).

Additionally, I.A. Grynsztein's conduct may violate the 18 U.S.C. § 1956 (money laundering) based on a number of potential predicate offenses. The main focus of the current Dutch investigation, the provision of unlicensed money services, is a predicate, or specified unlawful activity ("SUA"), for U.S. money laundering violations. *See* 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1) (listing 18 U.S.C. § 1960 as an SUA). There is evidence of concealment of the proceeds of that business, as CPG's stated business purpose, both in its corporate registration and representations made to its banks, started out as the sale of pharmaceuticals and morphed into the purchase and sale of women's garments, and neither activity accounts for any significant, legitimate commerce. Furthermore, the PIN terminals obtained from the German PSP, also by means of misrepresentation regarding their "use" at a retail store in Amsterdam, were secretly transported to Curaçao, where the sheer volume of transactions was inconsistent with a small retail business. In light of I.A. Grynsztein's false representations to both ING Bank in the Netherlands and the German PSP about the purpose of the CPG account and the use and true location of the PIN terminals through which the credit card transactions were processed, his conduct may also violate the money laundering statute based on one of the recognized foreign predicates contained in 18 U.S.C. § 1956(c)(7)(B)(iii), fraud against a foreign bank.[12]

### C. This Court Should Act to Enforce the Dutch Restraining Orders by Issuing a Restraining Order in a Manner Consistent with 18 U.S.C. § 983(j)(1).

The June 1 and June 23, 2015, Restraining Orders entered by the Dutch court reflect the intention of the Dutch Public Prosecutor to seek the confiscation of assets as a result of a

---

[12] ING Bank qualifies as a foreign bank under 12 U.S.C. § 3101(7) and B&S likely does as well, as a member of the German Savings Bank Finance Group.

16

criminal conviction against Itzhak Grynsztein, Ilona Grynsztein, Omer Grynsztein, Nachman Grynsztein, or CPG. Thus, the United States, acting in accordance with its treaty obligations, seeks to guarantee the effectiveness of any future confiscation order or judgment against these suspects' U.S. assets.

Applying the language of § 2467(d)(3)(A) and structure under 18 U.S.C. § 983(j)(1)(A), this Court possesses the authority to issue an order—consistent with the Dutch Restraining Orders—to "preserve the availability of property . . . subject to forfeiture" for the duration of the Dutch criminal and confiscation proceedings. *See* 28 U.S.C. § 2467(d)(3)(A) (specifying that the district court may enter a restraining order at any time before or after the initiation of foreign forfeiture proceedings). As such, this Court should recognize the five Restraining Orders from the District Court in Overijssel and enforce them according to their terms by restraining the specified assets and prohibiting the above-captioned Grynsztein family members, CPG, and all others from disposing of the financial assets, Florida properties, or rights thereto. To execute any restraining order issued by this Court, the United States would serve all relevant financial institution—including Bank of America, N.A., Citibank, N.A., and Pershing LLC—and would file a lis pendens on the Florida properties in Aventura and Boca Raton with the Miami-Dade County Clerk of Courts and the Palm Beach County Clerk and Comptroller, respectively. There are no known mortgages or liens on either of the real properties sought for restraint.

## VI.   CONCLUSION

The United States respectfully requests that this Court enforce the attached Dutch Restraining Orders, consistent with U.S. obligations under the relevant treaty, by entering the attached Proposed Restraining Order pursuant to this Court's authority under 28 U.S.C.

§ 2467(d)(3)(A), (d)(3)(B)(ii), and 18 U.S.C. § 983(j)(1)(A). The United States anticipates assistance from the National Public Prosecutor's Office in Rotterdam, in providing notice and a copy of any order issued by this Court to the affected Grynsztein family members and CPG once the assets are secured.

Respectfully submitted,

M. KENDALL DAY, CHIEF
ASSET FORFEITURE AND MONEY
   LAUNDERING SECTION

By: *Marybeth Grunstra*
A.J. DE KLUIVER
Assistant Deputy Chief
MARYBETH GRUNSTRA
Trial Attorney
U.S. Department of Justice
Criminal Division
Asset Forfeiture and Money
   Laundering Section
1400 New York Avenue NW, 10100
Washington, DC  20530
Telephone:  (202) 514-1263
Fax:              (202) 616-2547

Attorneys for Applicant
UNITED STATES OF AMERICA